Filed 7/16/14  P. v. Nealy CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F066533 |
| Plaintiff and Respondent, | (Super. Ct. No. VCF252271) |
| v. | |
| CARY MAURICE NEALY, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Valeriano Saucedo, Judge.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

A jury found appellant Cary Maurice Nealy guilty of unlawful sexual intercourse with a minor (Pen. Code,[1] § 261.5, subd. (d); count 1) and five counts of lewd acts upon a child (§ 288, subd. (c)(1); counts 2 through 6). He was sentenced to six years eight months in state prison.

On appeal, Nealy challenges his sentence, contending that the trial court abused its discretion by imposing the upper term for count 1 and consecutive terms for counts 3 through 6. He also requests that we vacate the order that he pay for a SART exam and correct a clerical error in the abstract of judgment.

We vacate the order that Nealy pay $800 for a SART examination and order the judgment modified to correct a clerical error. Otherwise, we affirm.

## FACTS

One day in late March or early April 2011, K.B. "ditched" school with a friend. K.B. was 15 years old and her friend was 16. As they walked down a street, they passed by Nealy's house, and he invited them over to hang out. The girls kept walking, and Nealy got in his car and drove toward them. He continued talking to the girls and asked their names.

Later that day, the girls went to Nealy's house. Nealy invited them in, and they went to the kitchen. He offered them wine. K.B.'s friend took a sip and gave the glass to K.B, who drank the rest of the wine. K.B. told Nealy she was 15 years old. A car pulled up to the house, and Nealy took the girls to the backyard. According to K.B.'s friend, Nealy told them, "My wife and my son are home, you have to go through the back, and I'll get you guys in a minute to walk you through." After about five minutes, Nealy got the girls, and they left the house. The girls started walking by themselves, and then Nealy picked them up in his car. The three of them went to the store and bought alcohol. Nealy drove the girls to a park where they drank and talked. Nealy took the girls to

---

[1] All further statutory references are to the Penal Code.

2.

Kentucky Fried Chicken and bought them lunch.  Then he dropped them off at K.B.'s high school.  Nealy said, "If you ever want to hang out, just let me know or come by."  There was no sexual talk during this encounter.

About a week later, K.B. snuck out of her house around 1:00 a.m. and went to her cousin's house.  After a short stay, she went to Nealy's house.  Nealy told K.B. she had to leave because he had company.  He told her to come back another time.  A couple days later, K.B. snuck out again and went to her cousin's house.  She then decided to go to Nealy's house.  According to K.B., she knocked on the door, and this time, Nealy invited her in.  He gave her a beer and invited her to his bedroom.  K.B. sat on the edge of the bed and drank beer.  Nealy asked K.B. if she wanted to lie down and watch television, and she agreed and lay down on the bed.  Nealy started to "French-kiss" her, meaning his tongue touched her tongue.  He grabbed her breasts over her clothes.  He told her to take off her clothes.  Nealy helped her get her clothes off and touched her vagina with his hand.  He kissed her neck and breast.  He got a condom from his nightstand and put it on.  Nealy and K.B. had sexual intercourse, and then he told her to leave.  K.B. went to the bathroom and got dressed.  Nealy told K.B. not to say anything, and she went home.

Later, K.B.'s younger sister told their mother that K.B. was sneaking out of the house.  K.B.'s mother confronted her about sneaking out, and K.B. told her mother what happened with Nealy.  On April 29, 2011, K.B. spoke to the police about Nealy.

Nealy was interviewed by a police officer on May 6, 2011.  He admitted that two young women had been to his house a couple months earlier.  He told the officer that the girls were walking in front of his house and he called out to them.  He eventually drove down the street and picked them up.  Nealy thought the girls were about 17 or 18 years old.  He reported that his fiancée came home while the girls were at the house and he told them to go to the backyard.  Nealy said that one of the girls came to his house again after midnight and he "shooed her away out to the street."  He told the officer that was the only other time the girl went to his house.  He said he had shown bad judgment:  "[B]ad

3.

judgment, me allowing these two people -- inviting them over here and then, uh, that night her coming over here and me not doing anything. That's bad judgment on my part."

The officer told Nealy his DNA was all over K.B.'s "crotch area." Nealy denied having sex with K.B. The officer asked Nealy, "Are you aware you're going to go to prison?" Nealy said, "Yeah. Hell yeah, I'm afraid. I'm afraid of getting accused for rape, for ... something I didn't do, yeah." Then the officer asked, "Are you saying you did not have sexual intercourse with her?" Nealy replied, "No, I'm not saying that. I'm saying I didn't rape her."[2] Nealy was 49 years old.

## PROCEDURAL HISTORY

Nealy was charged with one count of unlawful sexual intercourse with K.B., a minor under 16 years of age, by a person over the age of 21 years (§ 261.5, subd. (d); count 1) and five counts of lewd acts upon K.B., who was 15 years old, by a person at least 10 years older (§ 288, subd. (c)(1); counts 2 through 6).[3] It was further alleged that Nealy had a prior serious or violent felony conviction (i.e., a strike conviction). (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i).)

A jury found Nealy guilty of all six counts. In a bifurcated proceeding, the trial court found true the allegations of a prior strike conviction.

On December 18, 2012, the court held a sentencing hearing. The court granted Nealy's motion to strike the prior conviction under section 1385. In doing so, the court

---

[2]    Nealy did not testify at his trial. These facts are based on the police officer's testimony about his interview with Nealy.

[3]    Counts 2 through 6 alleged the following individual acts of sexual contact: count 2 -- "PENIS TO VAGINA," count 3 -- "TONGUE TO TONGUE," count 4 -- "MOUTH TO BREASTS," count 5 -- "MOUTH TO NECK," and count 6 -- "HAND TO VAGINA."

considered the fact that the prior strike was over 25 years old and it involved an offense that was materially different from his current convictions.

The report and recommendation of the probation officer (RPO) recommended Nealy be sentenced to state prison for six years. The RPO -- filed before the court struck Nealy's prior strike conviction -- assumed that the terms would be doubled because of the prior strike conviction. Six years (the middle term of three years doubled) was recommended for count 1. The RPO further recommended two years for count 2 to be stayed under section 654 and two years for each of counts 3 through 6 to be served concurrently.

The probation department had interviewed Nealy, and he denied culpability for any of the charges. He stated that he was only "guilty of having bad judgment," explaining that he should not have talked to unknown juvenile females or invited K.B. into his home. Nealy said that he "crossed the line" but denied that he had sexual intercourse with K.B. On the Static-99R, an actuarial risk instrument used to estimate a person's risk of reoffense, Nealy was in the "Moderate Low Risk Category for being charged or convicted of another sexual offense." Nealy's criminal record showed that he had been convicted of many misdemeanors from 1987 through 2010.

The RPO identified no factors in mitigation relating to the crime. It noted that Nealy's prior performance on probation had been satisfactory. As an aggravating factor relating to the crime, the RPO determined, "The manner in which the crime was carried out indicates planning, sophistication or professionalism, in that the defendant followed the victim in his car when she initially ignored his invitation to his apartment." The RPO noted that Nealy's "prior convictions as an adult are numerous."

The People filed a statement in aggravation. They too assumed the sentence would be doubled because of the prior strike conviction and requested the maximum term of 13 years four months. The maximum term appears to be based on eight years (the

upper term of four years doubled) for count 1, plus 16 months (one-third the middle term of two years doubled) consecutive for each of counts 3 through 6.

The People argued that the victim was particularly vulnerable. She was 15 years old and was not in the presence of an adult when she was initially contacted by Nealy. The victim was provided alcohol by Nealy. "It was late in the evening or early morning when [Nealy] had sexual intercourse with K.B. The only adult present was [Nealy] and he chose to take advantage of the vulnerability of K.B. at that time." The People asserted that the manner in which the crime was carried out indicated planning, sophistication, or professionalism:

> "[Nealy] took painstaking efforts to isolate [and] groom K.B. before molesting her. [He] initially approached K.B. and her 16-year-old friend as they walked by his residence. [Nealy] made further efforts to follow them in his vehicle when his initial calls were ignored. [He] finally got K.B. and her friend inside his residence where he poured them wine. [Nealy] made certain to hide the two girls when his fiancée unexpectedly showed up. Afterward, [he] further ingratiated himself to the girls by buying them more alcohol, taking them to Mooney Grove Park and by purchasing food for them at Kentucky Fried Chicken. Lastly, [Nealy] dropped the girls off right as school was getting out with a final invitation to stop by anytime. The testimony was clear that there was no sexual talk during the initial meeting. [Nealy] intended to avoid such talk in an effort to make K.B. feel comfortable around him, thereby winning her trust. The second time K.B. encountered [Nealy,] he asked her to leave only because his girlfriend was present at his residence; however, he specifically invited K.B. to come back again. K.B. did return and [Nealy] escorted her into his bedroom where he made sexual advances, molested and engaged in sexual intercourse with K.B. [He] used a condom and the testimony was clear that [he] did not use condoms with his girlfriend. [Nealy] planned his action and had the condom ready when the opportunity presented itself from the ground work he had orchestrated."

The People also argued that Nealy showed no remorse as he "maintained his innocence despite overwhelming evidence" and that he was a danger to society. They listed no mitigating factors relating to the crime or Nealy.

Nealy filed a response to the People's statement in aggravation and a separate statement in mitigation. He noted that K.B. admitted to officers she was not a virgin at the time of the offense. Nealy argued: "[F]or a person to be 'particularly' vulnerable implies a vulnerability beyond what is inherent in the crime itself. We cannot say that every commission of illegal sexual intercourse with a minor is an aggravated case.... What the Court must ask is whether this particular 15 year old girl was particularly vulnerable compared with 15 year old girls as a class. All evidence is to the contrary. We know from police reports that by her own admission this girl was not a virgin at the time she chose to have sex with Mr. Nealy, and we can certainly infer her understanding of and intent to commit that act when she repeatedly snuck out of her house late at night to visit an older man." In addition, Nealy did not have a special relationship with K.B.; he was not, for example, a priest, teacher, family member, or troop leader. Nealy disputed the People's characterization that he took "painstaking efforts" to isolate and groom K.B. While Nealy did approach K.B. and her friend and offered them alcohol, "once he found out how old they were, ... there were no inappropriate advances or ... any sexual talk" when K.B. went to Nealy's home the first time. He continued: "K.B. went to Mr. Nealy's home in the late evening hours, went into his home, followed him into his bedroom, and had consensual sex with him. No one had to be lured anywhere." Nealy also argued that counts 2 through 6 were all part of a single course of conduct and should be stayed under section 654.

In his statement in mitigation, Nealy asserted that K.B. "was an initiator of, willing participant in, or aggressor or provoker of the incident" citing California Rules of Court, rule 4.423(a)(2). He further asserted that the crime was committed because of an unusual circumstance, as "[i]t was only when confronted with the opportunity, in the dead of night, to have sexual relations with [K.B.], that Mr. Nealy made the wrong choice to break the law." (Cal. Rules of Court, rule 4.423(a)(3).) Nealy also submitted "letters of good character," which "describe a man who is hard-working, dependable, and who

has worked hard over the years to take care of his children and provide for his family."[4] At the sentencing hearing, the prosecutor told the court that the probation officer had believed that counts 3 through 6 should be concurrent "because she thought it was the same course of conduct in [section] 654." The prosecutor, however, asserted counts 3 through 6 could run consecutively.

In arguing against an aggravated term, Nealy's attorney asserted that Nealy did not pursue K.B. as he did not text, email, or call her. He reminded the court, "she was not -- this was not the first time," presumably meaning that K.B. was not a virgin. Nealy's attorney noted that K.B. snuck out of her house to visit Nealy, and "this was not the first time she snuck out." In addition, he argued: "[K.B.] was not reporting this, it was because she was caught by her mother because apparently her [younger sibling] had told on her. So this wasn't something that she was hiding because she was feeling guilty, she was hiding it because she was continuing to sneak out of the house."

Observing that a child should be safe at all times, the court told Nealy's attorney: "[T]o suggest that somehow a child places herself at risk simply because she's out at that time I think is wrong. From the Court's perspective, it appears like it's blaming the victim for placing herself in that situation." Nealy's attorney explained that he was not disputing whether it was a crime but was speaking "in the context of ... addressing the vulnerability of the victim." The court responded:

> "And I appreciate that. And I'm also saying that in that same context, one of trust and vulnerability. [¶] The trust factor is that we as adults do owe a responsibility to each other and to children in our community.... And you had a situation where this was an adult and a child, and it was the adult's responsibility to say to the child, no, get out of here, go back home, and not take advantage of the situation. [¶] …[T]hat's where the vulnerability of the child comes in. Because the child is not matured in reasoning and thinking, and adults are expected to be mature with respect to reasoning and

---

[4] According to the RPO, however, Nealy had three children by three different women, was in arrears on child support, and was currently unemployed.

maturity, and that's not what happened here. [¶] I wanted to address those issues clearly because that is my thinking on those issues, and that is that adults bear a certain responsibility to all children, and I think that's the heart of it here."

Nealy's attorney argued, "[T]hen that would make every case, sex with a minor, an aggravated sentence, and that's -- " The court disagreed, explaining:

> "When we see children that are not exercising appropriate choices, it is our responsibility to call the police to say there's a child in danger here, to call their parents, to call an adult, to get adults involved so those children may be redirected. [¶] And it is not an adult's responsibility to take advantage of that situation and say, well, this child is vulnerable and I'm going to exploit that vulnerability. And I think that that's what we have here. [¶] ... [¶] And I do find that Mr. Nealy's behavior was irresponsible. He at some point truly ascertained that this was a minor, a child. And instead of frankly saying no, get out of here, call the police, extricate himself from the situation, the Court truly does believe that he took advantage of the situation and took a posture that essentially said the following: Who are you going to believe, me, the adult, or that lying kid?"

The court indicated that it had read the statements in aggravation and mitigation and found that the factors in aggravation outweighed the factors in mitigation. It imposed the upper term of four years for count 1 and imposed consecutive eight-month terms (one-third of the middle term of two years) for counts 2 through 6, for a total term of six years, eight months. The term for count 2 was stayed pursuant to section 654.

Nealy was also ordered to pay a restitution fine and $800 for "the cost of the SART examination."

## DISCUSSION

I.    SENTENCING DECISIONS

A trial court has broad discretion to decide whether to select the upper, middle, or lower term of imprisonment (§ 1170, subd. (b); Cal. Rules of Court, rule 4.420(b)) and whether to run the prison terms on multiple offenses concurrently or consecutively (§ 669; Cal. Rules of Court, rule 4.425). (*People v. Clancey* (2013) 56 Cal.4th 562, 579). Accordingly, we review these sentencing decisions for abuse of discretion. (*People v.*

*Sandoval* (2007) 41 Cal.4th 825, 847; see *People v. Leon* (2010) 181 Cal.App.4th 452, 468.)

Nealy contends the trial court erred by (1) using an invalid reason in selecting the upper term and then (2) using the same invalid reason for selecting consecutive terms. Specifically, he argues the trial court abused its discretion by relying on "the victim being vulnerable due to her age, and [Nealy] failing to act as a responsible adult by taking advantage of her age-based vulnerability."

A. Upper Term for Count 1

California Rules of Court, rule 4.421 sets forth various aggravating circumstances to be considered in determinate sentencing. Factors related to the crime include: "[t]he victim was particularly vulnerable;" "[t]he manner in which the crime was carried out indicates planning, sophistication, or professionalism;" and "[t]he defendant took advantage of a position of trust or confidence to commit the offense." (Cal. Rules of Court, rule 4.421(a)(3), (8), and (11).) "'[A] "particularly vulnerable" victim is one who is vulnerable "in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act...." [Citation.]'" (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 558.)

Nealy contends that the court found K.B. was vulnerable solely because of her age and because Nealy, as an adult, was irresponsible for taking advantage of that vulnerability, but the age of the victim and the perpetrator were already elements of the offenses. Section 261.5, subdivision (d), makes it unlawful for a person who is at least 21 years old to have sexual intercourse with a minor under 16 years of age. Section 288, subdivision (c)(1), applies to lewd or lascivious acts with a victim who is 14 or 15 years by a person who is at least 10 years older than the victim. A fact that is an element of the crime upon which punishment is being imposed may not also be used to impose the upper

10.

term.  (Cal. Rules of Court, rule 4.420(d).)  Therefore, Nealy argues, K.B.'s young age and Nealy's status as an adult cannot be used to impose the upper term for count 1.

Nealy is correct that imposing an upper term "due to 'particular vulnerability,' where vulnerability is based *solely* on age, is improper when age is an element of the offense.  [Citations.]"  (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1693-1694, overruled on another ground in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123; accord, *People v. Alvarado* (2001) 87 Cal.App.4th 178, 195.)  We disagree, however, with Nealy's characterization of the trial court's determination.  Based on our reading of the transcript of the sentencing hearing, we do not believe the court found K.B. to be vulnerable *solely* because she was 15 years old.  Nealy's attorney argued that the court's discussion of victim vulnerability appeared to apply to every case of sex with a minor, since every victim would be vulnerable based on age.  The court rejected Nealy's argument.  In doing so, the court described "children that are not exercising appropriate choices," suggesting that K.B. was particularly vulnerable because she had made inappropriate choices including sneaking out of her house in the middle of the night, and, earlier, ditching school and drinking alcohol with a much older man.  The court further stated that Nealy "took advantage of the situation," suggesting that K.B.'s circumstances of being out unsupervised in the middle of the night and, thus, """"unprotected, accessible, [and] assailable,""" made her particularly vulnerable to his sexual advances.  (*People v. Esquibel*, *supra*, 166 Cal.App.4th at p. 558.)

"'[P]articular vulnerability' is determined in light of the 'total milieu in which the commission of the crime occurred ….'  [Citation.]"  (*People v. Dancer*, *supra*, 45 Cal.App.4th at p. 1694; accord, *People v. Ramos* (1980) 106 Cal.App.3d 591, 607, disapproved on another ground in *People v. Scott* (1994) 9 Cal.4th 331 353, fn. 16 [basis for finding of vulnerability may include circumstances of commission of crime and is not limited to victim's personal characteristics].)  Here, it was not an abuse of discretion for the court to determine K.B. was particularly vulnerable because, among other things, she

11.

had snuck out of her house and was out on the street, unprotected, in the middle of the night when the crime occurred.

B.  Consecutive Terms for Counts 2 through 6

"Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except:  [¶]  (1) A fact used to impose the upper term; [¶]  (2) A fact used to otherwise enhance the defendant's prison sentence; and [¶] (3) A fact that is an element of the crime may not be used to impose consecutive sentences."  (Cal. Rules of Court, rule 4.425(b).)

Nealy contends that the trial court improperly used victim vulnerability a second time to impose consecutive terms for counts 3 through 6.[5]  The People assert that the issue of double-counting a sentencing factor has been forfeited.  We agree.

"A party in a criminal case may not, on appeal, raise 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' if the party did not object to the sentence at trial.  [Citation.]  The rule applies to 'cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons' [citation], but the rule does not apply when the sentence is legally unauthorized [citation]."  (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751, citing *People v. Scott*, *supra*, 9 Cal.4th at pp. 353-354.)

Our Supreme Court has explained the reasons for this rule:  "Our reasoning is practical and straightforward.  Although the court is required to impose sentence in a lawful manner, counsel is charged with understanding, advocating, and clarifying permissible sentencing choices at the hearing.  Routine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention.  As in other

---

5      Nealy acknowledges these counts are not subject to stay under section 654.

12.

waiver cases, we hope to reduce the number of errors committed in the first instance and preserve the judicial resources otherwise used to correct them." (*People v. Scott*, *supra*, 9 Cal.4th at p. 353.)

Nealy responds that the issue was not forfeited "because the trial court did not indicate its intention to [impose both the upper term and consecutive terms] and then allow counsel for [Nealy] to articulate an objection." We disagree.

The court announced: "I have read the statement in aggravation. I've read the statement in mitigation. And I find that [the] statement in aggravation outweighs the statement in mitigation, so I do intend to impose the six years, eight months." Nealy's attorney responded: "Your Honor that assumes the Court is going to stack [i.e., order consecutive terms] -- which I believe the Court is wrong in doing .... The Court has discretion to not stack those and that's what Probation's recommendation was. So it's not a matter that the Court has to do so. The Court's already imposing the aggravated sentence."

The response of Nealy's attorney shows that he was allowed to articulate objections after the court stated its intention to impose consecutive terms. Nealy's attorney disagreed with the imposition of consecutive terms, and he pointed out the consecutive terms were not required by law. But he did not object to consecutive sentencing based on double-counting the sentencing factor of victim vulnerability. Had Nealy's attorney called the issue to the court's attention, the alleged defect in the court's statement of reasons could have been "easily prevented and corrected." (*People v. Scott*, *supra*, 9 Cal.4th at p. 353.)

Most likely, if Nealy's attorney had raised the issue of double-counting, the court would have identified a separate aggravating factor to support consecutive sentencing. The RPO and the People suggested the aggravating factors of planning and sophistication and danger to society. The court itself mentioned the issue of "trust," which could be understood as the aggravating factor of taking advantage of a position of trust or

13.

confidence.  Remand for resentencing is only necessary if the sentencing error causes prejudice.  (*People v. Avalos* (1984) 37 Cal.3d 216, 233 [affirming sentence despite improper dual use of facts because it was not reasonably probable that a more favorable sentence would have been imposed in absence of the error].)  Here, given the court's clear intention to impose consecutive terms and the multiple bases in the record for doing so, we do not find it reasonably probable that a more favorable sentence would be imposed if the matter were to be remanded for resentencing.

II.      ORDER TO PAY FOR SART EXAMINATION

Nealy asserts the judgment must be corrected to vacate the order that he pay $800 for a SART examination because no SART exam was performed in this case.  The People concede that order to pay $800 was unauthorized and should be vacated.  We agree.  There is no evidence in the record that K.B. had a SART exam, and a police officer testified that the incident was reported about a month later, and "the time frame would be too long to recover anything from the victim" from a medical exam.

We will vacate the order that Nealy pay for a SART examination and direct the trial court to modify the abstract of judgment to delete the order that Nealy pay $800.

III.     ABSTRACT OF JUDGMENT

Finally, Nealy points out that the abstract of judgment incorrectly lists the principal term for count 1 as "6" years.  The trial court announced a term for count 1 of four years, which is the upper term for violation of section 261.5, subdivision (d).  The People agree that the inaccuracy in the abstract of judgment should be corrected.  Accordingly, we will direct the trial court to correct the abstract of judgment by replacing "6" with "4" as the time imposed for count 1.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## DISPOSITION

The order that Nealy pay $800 for a SART examination is vacated.  The trial court is directed to modify the abstract of judgment by (1) deleting reference to payment of

14.

$800 for a SART examination and (2) deleting the "6"-year term for count 1 and replacing it with a "4"-year term.  The judgment is affirmed in all other respects.

_____

Franson, J.

WE CONCUR:


_____

Cornell, Acting P.J.


_____

Detjen, J.